J-S53023-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| FARUQ ROBINSON | |
| Appellant | No. 3377 EDA 2017 |

Appeal from the Judgment of Sentence Entered September 15, 2017
In the Court of Common Pleas of Philadelphia County
Criminal Division at No.: CP-51-CR-0004473-2013;
CP-51-CR-0004877-2013; CP-51-CR-0004834-2013;
CP-51-CR-0004879-2013; and CP-51-CR-0004878-2013

BEFORE:  OLSON, STABILE, and NICHOLS, JJ.

MEMORANDUM BY STABILE, J.:                **FILED DECEMBER 31, 2019**

Appellant Faruq Robinson appeals from the September 15, 2017 judgments of sentence entered in the Court of Common Pleas of Philadelphia County ("trial court"), following his jury convictions for involuntary deviate sexual intercourse ("IDSI") with a complainant who is less than 16 years of age, unlawful contact with minors, corruption of minors, and four counts of endangering the welfare of children ("EWOC").[1]  Upon careful review, we affirm.

---

[1] 18 Pa.C.S.A. §§ 3123(a)(7), 6318, 6301(a), 4304(a)(1), respectively.

The facts and procedural history of this case are undisputed.[2] As a result of sexually abusing his niece and physically abusing his four daughters, Appellant was charged, *inter alia*, with the foregoing crimes. On July 11, 2016, Appellant filed a pretrial motion seeking to suppress "any and all statements" he made to law enforcement. Suppression Motion, 7/11/16 (unpaginated). In support, Appellant asserted that the police questioned him without his consent or without obtaining from him a waiver of his right against self-incrimination. As a result, Appellant argued that "any statements obtained from [him] were neither knowing, voluntary or authentic." ***Id.*** at ¶ 4.

On May 22, 2017, the trial court conducted an evidentiary hearing on Appellant's suppression motion. At the hearing, the Commonwealth offered the testimony of Special Agent Robert Walker of the United States Secret Service. Agent Walker testified that Appellant was not under arrest at the time of the interview. N.T. Hearing, 5/22/17 at 14. Agent Walker further testified that he read Appellant his ***Miranda***[3] rights prior to the interview. ***Id.*** at 15. Counsel for the Commonwealth rested, believing that Agent Walker's testimony was sufficient to establish Appellant's waiver of his right against self-incrimination. The trial court disagreed and granted Appellant's suppression motion. The Commonwealth immediately attempted to reopen the hearing but was denied on the condition that it may do so if it provided

___

[2] Unless otherwise specified, these facts come from the trial court's October 23, 2018 opinion filed pursuant to Pa.R.A.P. 1925(a).

[3] ***Miranda v. Arizona***, 384 U.S. 436 (1966).

- 2 -

case law to the trial court showing that the testimony of Agent Walker was sufficient to show a waiver of *Miranda* rights. That evening, the Commonwealth filed a written motion to reopen the suppression hearing, asserting that reopening was in the interest of justice. The following morning, prior to the start of trial, the trial court conducted a hearing on the Commonwealth's motion at which counsel for the Commonwealth stated:

> this is a case where the allegation is [Appellant] walked into special victims after having requested to give a statement and to undergo a polygraph examination, was given the polygraph examination, was given his *Miranda* warnings and waived his *Miranda* warnings and at the conclusion said, 'I licked this child's vagina.

N.T. Hearing, 5/23/17 at 8. Based on this explanation, the trial court found that there were questions surrounding Appellant's custodial status at the time of the polygraph test. Further, the court found that there was an assertion that Appellant made a confession to the sexual assault of a child. Thus, the trial court, in its discretion, found that it was in the interest of justice to allow the reopening of the suppression hearing to hear supplemental testimony.

At the supplemental hearing, the Commonwealth once again introduced the testimony of Agent Walker, who testified that Appellant arrived for the polygraph test on his own volition, without handcuffs or any type of restraints, and was not placed in restraints of any kind throughout the test. *Id.* at 18-19. Moreover, Agent Walker's testimony indicated that Appellant was offered breaks or cessation of the test at Appellant's request. Agent Walker also detailed his demonstration of Appellant's *Miranda* rights to him and

Appellant's voluntary waiver of those rights prior to the test. The trial court thus determined that the polygraph test performed by Agent Walker "did not amount to a custodial interrogation." Trial Court Opinion, 10/23/18 at 13. The court found that "there is no evidence on the record to suggest that [Appellant] was in custody during this interview because his freedom was in no way restricted during the course of the polygraph test and thus *Miranda* warning were not necessary." *Id.* at 13-14.

A jury trial was conducted on May 23, 2017 at which the Commonwealth called to the stand Appellant's niece, his four daughters and Agent Walker, among others. His niece, C.M. ("Victim 1"), testified that, on December 31, 2008, when she was fourteen years old, she attended a New Year's Eve party at Appellant's residence located on 2949 North 13th Street in Philadelphia. *Id.* at 62-64. Victim 1 testified that Appellant woke her up in the early hours of January 1, 2009, and ushered her downstairs to the kitchen where he asked her to remove her pants and panties. After Victim 1 acquiesced to his demand to spread her legs, Appellant performed oral sex on her. Later in the morning of January 1, 2009, Victim 1 notified her aunt—Appellant's wife C.R.—about what Appellant had done. Later that day, Victim 1, accompanied by her parents, went to the Philadelphia Police Department's Special Victim's Unit ("SVU"), where she told Detective Norma Serrano that Appellant sexually abused her.

Appellant's step-daughter, A.B. ("Victim 2"), the eldest of his four daughters,[4] testified to the punishments that she and her sisters received from Appellant. N.T. Trial, 5/23/17 at 91-94. Victim 2 and her sisters moved out of Appellant's house at 2949 North 13th Street in Philadelphia, Pennsylvania, when she was fifteen years old. The children went to live with their grandparents about a week after their mother passed away in the summer of 2012. Victim 2 testified that when she and her sisters still lived with Appellant, he would often force them into pushup position and strike them with belts, wooden bed slats, extension cords, poles, or virtually anything Appellant could get his hands on. Sometimes the beatings would occur while the girls were not wearing clothes. Because of those beatings, Victim 2 had welts and bruises on her body, often for minor rule violations. Describing the beatings by Appellant, Victim 2 testified, "[i]t seemed like it was a game, like it was fun for him to do." *Id.* at 111.

Victim 2 testified to three separate instances in which she was hospitalized because of Appellant's conduct. Describing the first instance of hospitalization when she was in eighth grade, Victim 2 testified: "[w]e were all getting in trouble because somebody made lemonade in the water bottle and nobody told who did it. . . . Everybody was in a push-up position and we were all getting in trouble. . . . I got pushed into the radiator and a gash in

---

[4] Victim 2 is Appellant's step-daughter whereas the other three (Victims 3, 4 an 5) are his biological daughters. N.T. Trial, 5/23/17 at 92, 115; N.T. Trial, 5/24/17 at 43, 59.

my head. . . . I don't know who did it. I know I got pushed into the radiator."

*Id.* at 95-96. Describing the second instance requiring hospitalization, Victim 2 testified:

> We were told to fold a bunch of bags of clothes. I don't know how many bags of clothes, it was a lot. It filled up most of the front room. We were folding all night and we were getting tired so we ended up falling asleep on the bags. The next morning [Appellant] came downstairs and started beating everybody. I ran into the kitchen because I couldn't take the hits. I ran into the kitchen and hid under the table. He flipped the table on my hand. . . . He was still trying to get to me with the belt.

*Id.* at 97-98. As a result of that incident, Victim 2 had two broken fingers. Victim 2 then testified to the third incident resulting in her hospitalization: "I went up to the third-floor bathroom, a place where nobody even uses, and I was getting hit. I don't know with what, but I was getting hit, and I kicked the bathroom pole and it went into my foot." *Id.* at 101. Victim 2 testified that it was her mother who took her to the hospital. *Id.* at 97-100. Victim 2 further testified that, before she went to the hospital, Appellant told her "to say we were playing it was an accident." *Id.* at 97-100.

Appellant's daughter, I.B. ("Victim 3"), the second oldest of his daughters, testified that she lived with him until the girls moved out when she was thirteen. When examined as to whether the beatings happened to her specifically, or to all of the girls, Victim 3 testified: "It was usually all four of us, unless it was something like, that one of us did individually, like a bad grade or something like that. But usually just all of us." *Id.* at 119. Victim 3 testified that all of the girls were beaten with broomsticks, wooden panels, belts, and a bat. She also stated that the girls were hit all over their bodies.

Victim 3 testified to the visible bruising and welts left on her and her sisters because of Appellant's punishments. Victim 3 further testified to Victim 2's three hospitalizations involving the gash from the radiator, the table breaking her fingers, and the foot injury. Victim 3 finally testified to a time when Appellant hit her with a braided belt, resulting in the skin being taken off her face. *Id.* at 119-20.

The second youngest of Appellant's daughters, C.B. ("Victim 4"), testified that she lived with her father until she was about eleven years old. Victim 4 testified that the girls were often forced into pushup position by Appellant, where they would be hit with metal spoons, extension cords, bats, and wooden bed slats. Victim 4 further testified that an example of a standard punishment the girls faced would be a beating with a wooden panel if they did not clean their room. Victim 4 also testified: "We had to get in the shower and got in trouble in the shower. . . . He had a belt and we got hit while the shower was running." N.T. Trial, 5/24/17 at 73. The girls were not wearing clothing during beatings in the shower. The frequency of the abuse, according to Victim 4's testimony, was "twice a week, two, three times a week." *Id.* at 66. Because of the beatings, Victim 4 testified to the bruising on the girls' bodies as "red marks or sometimes blue, purple if it was that bad." *Id.* at 75. Victim 4 recounted that she shared the abuse with her first-grade teacher because "I couldn't sit down because bruises on my legs. She asked me what happened, like why was—why I couldn't sit down. I told her and she looked at the bruises and she took me to the principal and they called DHS." *Id.* at

78. Victim 4 also testified to and confirmed Victim 2's three hospitalizations. In specific, Victim 4 recounted that she "heard a table fall and my sister came out with her hand bleeding. Her fingers were, like hanging off. My mom took her to the hospital." *Id.* at 67.

Appellant's youngest daughter, B.B. ("Victim 5"), testified that she lived with her father until she was nine. Victim 5 testified: "We would get beat mostly with belts," but also mentioned beatings with broomsticks and bats. *Id.* at 46. Victim 5 also testified: "Usually, I would get in trouble, like, it would be all of us together. I never got in trouble separately." *Id.* at 48. According to Victim 5, the girls were hit "everywhere" and that these beatings would occur "every other day," sometimes with clothing on, sometimes not. *Id.* at 46-47, 54. Describing the welts left on her body because of Appellant's punishment, Victim 5 testified that sometimes she had to wear different clothing to hide them. Victim 5 also testified to Victim 2's hospitalizations, mentioning specifically the gash on Victim 2's forehead from the radiator and her broken fingers. Regarding the gash on Victim 2's forehead, Victim 5 testified that Victim 2 was alone in the room with Appellant when it happened. Finally, Victim 5 recalled an incident when "a roach had crawled in the cereal" and Appellant told them "to eat it." *Id.* at 52.

The Commonwealth next called to the stand Agent Walker, who testified that, on April 9, 2009, he was brought in to perform a polygraph test on Appellant. N.T. Trial, 5/24/17 at 146-48. The polygraph test took place in the Episcopal Hospital interview room, in the SVU. Appellant drove himself to

the interview.[5]  *Id.* at 147.  Agent Walker testified that Appellant came voluntarily and waived his *Miranda* rights, written and orally, prior to taking the polygraph test.  The written waiver, however, was not available at trial.  Agent Walker testified:  "[i]t was a completely voluntary process, he was allowed to leave at any time, he's allowed to request counsel at any time."  *Id.* at 156.  Agent Walker further testified that, at the conclusion of the polygraph test, Appellant voluntarily signed a handwritten confession, which reads: "I agree with [Victim 1's] story.  I had no reason to be alone with you in the kitchen and I put my tongue on your vagina.  I made a fucked up decision and now have to live with it.  I am very sorry."  *Id.* at 151.

In response, Appellant testified on his own behalf.  He testified that he requested an interview with Special Agent Robert Walker of the United States Secret Service.  N.T. Trial, 5/25/17, at 28.  Appellant testified that he drove himself to the polygraph test with Special Agent Walker.  Appellant testified that he was offered breaks at any time, and that he took two breaks during the interview.  When asked whether he was free to leave the polygraph test, Appellant testified, "absolutely."  *Id.* at 30.  During cross-examination, Appellant was asked "after they talk to you about what your *Miranda* warnings are, you tell them you're happy to talk to them?" to which Appellant testified, "Absolutely, yes."  *Id.* at 31.  Appellant testified that he handwrote

_____

[5] Appellant also acknowledged that he requested and voluntarily appeared for the interview with Agent Walker and understood that he was free to leave or terminate the interview at any time.  N.T. Trial, 5/25/17 at 29-30.

the confession to performing oral sex on Victim 1. *Id.* at 35-36. Appellant also testified that he disciplined his children with a belt for purposes of punishment for flouting his rules. *Id.* at 22, 45. He testified that he had seen the resulting bruises and welts on his children and used cocoa butter to heal them. *Id.* at 23.

Appellant also offered the testimony of his younger sister, Sakinah Alexander, who testified that during the relevant timeframe she did not observe any injuries on any of the children. *Id.* at 15. Furthermore, Appellant called to the stand Dr. Sharon McClain, a mental health clinician at Wedge Mental Health Clinic. N.T. Trial, 5/24/17 at 160. Dr. McClain testified that Appellant and "his wife were involved in counseling, family counseling." *Id.* She testified that she had an opportunity to get to know Appellant's children, "from the youngest to the oldest." *Id.* Dr. McClain testified that after leaving her employment, she eventually became "fast friends" with Appellant's family. *Id.* at 161. "There were times when I spoke with the children by themselves. There were problems in school that individually they had been having. So it went from having them as clients to being best friends." *Id.* While having Appellant's family as her clients, Dr. McClain was a "mandatory reporter" of sexual or domestic abuse involving children. *Id.* She finally testified that she never reported any abuse with respect to Appellant's children. *Id.* Lastly, Appellant presented his father's, Daryle Robinson, testimony. Mr. Robinson testified that during his visits to Appellant's home, he did not notice any injuries to any of Appellant's children. *Id.* at 166.

Following trial, on May 30, 2017, the jury found Appellant guilty of IDSI with a complainant who is less than 16 years of age, unlawful contact with minors, corruption of minors, and four counts of EWOC. On September 15, 2017, the trial court sentenced Appellant to an aggregate term of 10 to 24 years' imprisonment. Appellant filed post-sentence motions, which the trial court denied on September 28, 2017. Appellant timely appealed.[6] Both Appellant and the trial court complied with Pa.R.A.P. 1925.

On appeal, Appellant raises three issues for our review:

[I.] Did the trial court err by granting Commonwealth's motion to re-open evidentiary hearing where the Commonwealth intentionally omitted evidence?

[II.] Is the evidence insufficient to prove Appellant guilty beyond a reasonable doubt of [EWOC] where the children were not in circumstances that could threaten their welfare, Appellant did not act or fail to act in protecting their welfare, and use of force was justified corporal punishment?

[III.] Did the trial court err by denying Appellant's motion for a new trial for the [EWOC] convictions, where the verdict was contrary to the weight of the evidence because any of force was justified corporal punishment?

Appellant's Brief at 5 (unnecessary capitalizations omitted).

_____

[6] Although Appellant filed a notice of appeal within thirty days of the judgment of sentence, Appellant did not separately appeal the judgments of sentence registered under different docket numbers. In **Commonwealth v. Walker**, 185 A.3d 969 (Pa. 2018), our Supreme Court confronted a situation where a litigant filed a single notice of appeal from an order that resolved issues relating to four different docket numbers and, on that notice of appeal, the litigant listed all four docket numbers. **Walker**, 185 A.3d at 974. The **Walker** Court held: "when a single order resolves issues arising on more than one lower court docket, separate notices of appeal must be filed. The failure to do so will result in quashal of the appeal." **Id.** at 977. **Walker**, however, is prospective, and Appellant's appeal was taken before **Walker** was decided. Because **Walker** is inapplicable, we decline to quash the instant appeal.

We address Appellant's claims *seriatim*. Appellant first argues that the trial court abused its discretion in granting the Commonwealth's motion to reopen the suppression hearing. **See** Appellant's Brief at 13. Appellant points out that the Commonwealth intentionally and "deliberately chose to introduce certain evidence and, more importantly, to omit other evidence." **Id.** at 14. Further, Appellant claims that the Commonwealth did not establish that he "was not in custody" at the time of the polygraph test. **Id.** Appellant further claims that the Commonwealth merely introduced Agent Walker's statement that he apprised Appellant of his **Miranda** rights, but did not introduce any evidence that Appellant understood the warning or voluntarily relinquished his right against self-incrimination. **Id.** at 15. Appellant maintains that the Commonwealth did not produce any such evidence despite being invited by the trial court to do so and rested its case. **Id.**

> Pennsylvania law is well-settled:
>
> It is within the trial court's discretion to allow either side to reopen its case, prior to judgment, to prevent a failure or miscarriage of justice. The admissibility of evidence is a matter solely within the discretion of the trial court. This court will reverse an evidentiary ruling only when a clear abuse of discretion has occurred. The trial court may exclude evidence which is merely cumulative of other evidence.

**Commonwealth v. Smith**, 694 A.2d 1086, 1091 (Pa. 1997) (quotation and citations omitted).

Instantly, we cannot conclude that the trial court abused its discretion in granting the Commonwealth's motion to reopen the suppression hearing. As detailed above, the trial court initially granted Appellant's suppression

motion, concluding that the Commonwealth failed to establish that Appellant was given **Miranda** warnings or that he understood and relinquished the same. However, soon after, it became apparent that Appellant's custodial status was less than clear and that Appellant indeed had requested and voluntarily appeared for the polygraph test. As a result, the trial court granted the Commonwealth's motion for purposes of fleshing out the facts concerning Appellant's custodial status and correcting a possible miscarriage of justice by suppressing Appellant's confessional statement given to Agent Walker at the conclusion of the polygraph test. Even if the trial court had not granted the Commonwealth's motion, there was sufficient evidence presented at the initial suppression hearing to suggest that Appellant was not in custody at the time of the April 9, 2009 polygraph test to trigger a **Miranda** warning. Accordingly, Appellant's first issue does not merit relief.[7]

We next address Appellant's challenge to the sufficiency of the evidence. In this regard, Appellant argues that the evidence "is insufficient to prove that the children were in circumstances that could threaten their welfare, or that [Appellant] acted or failed to act in protecting their welfare." Appellant's Brief at 18. Appellant claims that his "actions indicate that, to the contrary, he was

_____

[7] To the extent Appellant claims that the Commonwealth intentionally withheld evidence concerning his custodial status, such claim is bereft of record support. The record, as recited above, merely demonstrates that the Commonwealth, represented by an inexperienced prosecutor (N.T. Hearing, 5/22/17 at 17) ("I've been in this office for four months"), committed a simple error in failing to highlight Appellant's custodial status when contesting the suppression motion.

concerned with their welfare as he would always rub cocoa butter on any welts that they would have." *Id.* at 19. Alternatively, Appellant argues that the evidence is insufficient to establish EWOC because "his conduct was justified corporal punishment." *Id.* at 20.

"A claim challenging the sufficiency of the evidence is a question of law." *Commonwealth v. Widmer*, 744 A.2d 745, 751 (Pa. 2000).

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Antidormi*, 84 A.3d 736, 756 (Pa. Super. 2014), *appeal denied*, 95 A.3d 275 (Pa. 2014).

EWOC is defined in Section 4304, which provides in relevant part that "[a] parent, guardian or other person supervising the welfare of a child under 18 years of age, or a person that employs or supervises such a person, commits an offense if he knowingly endangers the welfare of the child by violating a duty of care, protection or support." 18 Pa.C.S.A. § 4304(a)(1). Section 302(b) of the Pennsylvania Crimes Code provides:

(2) A person acts knowingly with respect to a material element of an offense when:

      (i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and

      (ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.

18 Pa.C.S.A. § 302(b). In ***Commonwealth v. Sebolka***, 205 A.3d 329 (Pa.

Super. 2019), we explained:

This Court has employed a three-prong test to determine whether the Commonwealth's evidence is sufficient to prove that a defendant knowingly violated a duty of care under Section 4304(a)(1): (1) the accused must be aware of his or her duty to protect the child; ***(2) the accused must be aware that the child is in circumstances that could threaten the child's physical or psychological welfare***; and (3) ***the accused either must have failed to act, or must have taken action so lame or meager that such actions cannot reasonably be expected to protect the child's welfare***.

***Sebolka***, 205 A.3d at 337 (citing ***Commonwealth v. Smith***, 956 A.2d 1029,

1038 (Pa. Super. 2008)) (formatting altered) (emphasis added). In

***Commonwealth v. Mack***, 359 A.2d 770 (Pa. 1976), our Supreme Court

explained:

The purpose of juvenile statutes, as the one at issue here, is basically protective in nature. Consequently these statutes are designed to cover a broad range of conduct in order to safeguard the welfare and security of our children. Because of the diverse types of conduct that must be circumscribed, these statutes are necessarily drawn broadly. It clearly would be impossible to enumerate every particular type of adult conduct against which society wants its children protected. We have therefore sanctioned statutes pertaining to juveniles which proscribe conduct producing or tending to produce a certain defined result rather than itemizing every undesirable type of conduct. . . . . Thus, statutes such as the one at issue here are to be given meaning by reference to the common sense of the community and the broad protective purposes for which they are enacted.

*Mack*, 359 A.2d at 772 (formatting altered; citations and quotation marks omitted).

Instantly, based upon the evidence presented at trial, as detailed above and viewed in a light most favorable to the Commonwealth, we agree with the trial court's conclusion that the Commonwealth proved beyond a reasonable doubt that Appellant committed EWOC.

First, it is uncontested that Appellant owed a duty of care to his daughters and that he breached the duty by repeatedly subjecting them to physical abuse. Second, the evidence recited earlier demonstrates that Appellant knowingly placed his daughters in circumstances that could and did threaten their physical and psychological welfare. *Commonwealth v. Winger*, 957 A.2d 325, 329 (Pa. Super. 2008) (In the context of EWOC, "intent [often] cannot be proven directly but must be inferred from examination of the facts and circumstances of the case. Therefore, the Commonwealth is not required to provide direct proof of [a defendant's] frame of mind.") (citations omitted), *abrogated on other grounds by Commonwealth v. Dantzler*, 135 A.3d 1109 (Pa. Super. 2016) (*en banc*). Appellant's children, Victims 2, 3, 4, and 5 testified that he struck them—often when they were forced into a pushup position—with belts, bats, broomsticks, wooden bed slats, extension cords, poles or anything he could get his hands on. He would hit them all over their bodies. Sometimes, when the beatings occurred, the girls were not wearing any clothes. Because of these beatings, the girls would suffer visible bruises and marks. In fact, Victim 3 recounted

an incident where Appellant hit her with a braided belt, resulting in the skin being taken off her face. In addition to the physical abuse, Victim 5 testified that Appellant made the girls eat a roach that had crawled in their cereal. Finally, the evidence in this case indicates that Appellant did not dial back the physical abuse directed at his daughters and that he failed to take any actions that reasonably could be expected to protect their welfare. On the contrary, Appellant told Victim 2 to inform the hospital staff that her injuries were a result of an accident. It long has been recognized that a defendant's attempts to cover up after a crime can be inferred to demonstrate a consciousness of guilt. *See Commonwealth v. Bradley*, 69 A.3d 253, 258 (Pa. Super. 2013) ("The fabrication of false and contradictory accounts by an accused criminal, for the sake of diverting inquiry or casting off suspicion, is a circumstance always indicatory of guilt.") (citations omitted), *appeal denied*, 79 A.3d 1095 (Pa. 2013). Accordingly, Appellant's sufficiency claim is without merit.

To the extent Appellant specifically challenges the sufficiency of the evidence with respect to Victim 2, such challenge likewise is without merit. Appellant argues that the evidence was insufficient to sustain his conviction for EWOC because he was not responsible for Victim 2's injuries. Appellant claims that he did not push her into the radiator, but took her to the hospital afterwards. Appellant's Brief at 19. He also claims that he is not responsible for her broken fingers. *Id.* He argues that when he flipped over the table under which Victim 2 was hiding, he did not know "that this act would threaten [Victim 2's] welfare." *Id.* "It is just as likely that this was an accident." *Id.*

- 17 -

Appellant, however, points out that he took Victim 2 to the hospital. ***Id.*** Finally, Appellant claims that he did not cause Victim 2's foot injury. ***Id.*** at 19-20. According to Appellant, "while [he] was punishing her, [Victim 2] kicked a bathroom pole and it went through her foot." ***Id.*** at 20. He asserts that he took Victim 2 to the hospital afterwards. ***Id.***

The Commonwealth notes:

[Appellant's] arguments defy common sense. Simply because he did not directly cause the injuries does not mean he did not knowingly put [Victim 2] in a situation where injury would likely result. Even if it were one of [Appellant's] other daughters who pushed [Victim 2] into the radiator, [Appellant] nonetheless put his children in a circumstance that could threaten their physical welfare by beating them with his belt [and other objects] to the point that they were pushing each other into radiators to escape. Similarly, any rational adult would understand that flipping over a kitchen table, under which his daughter hid from his repeated blows, places her in a position to be injured, as does beating her on the bathroom floor near poles on which she could impale her foot.

Commonwealth's Brief at 18. We agree. ***See Commonwealth v. Smith***, 956 A.2d 1029, 1038 (Pa. Super. 2008) ("The 'knowing' element of the crime applies to the general issue of whether the defendant knew that he was endangering the child's welfare, ***not whether the defendant knew that he would cause any particular result***.") (emphasis added), ***appeal denied***, 989 A.2d 917 (Pa. 2010); ***see also Commonwealth v. Passarelli***, 789 A.2d 708 (Pa. Super. 2001) (evidence sufficient for EWOC where appellant's act "was not designed to protect, care or support" the child), ***abrogated on other grounds by Commonwealth v. Spruill***, 80 A.3d 453 (Pa. 2013).

Appellant's bald argument that his application of cocoa butter on wounds or his taking Victim 2 to the hospital after each incident of abuse demonstrates an intent to care for or protect the children's welfare is without merit. First, as the Commonwealth notes, Appellant does not cite any legal authority for the proposition that application of cocoa butter on wounds is sufficient remedy for beating a minor with belts, bats, broomsticks, wooden bed slats, extension cords, or poles. Second, the application of cocoa butter was not Appellant's idea, but rather the idea of his daughters' mother. N.T. Trial, 5/25/17 at 23. Appellant concedes that the mother used cocoa butter because "she knew it would heal the skin." *Id.* Likewise, Victim 2's trips to the hospital do not illustrate Appellant's intent to care for her. As indicated above, Victim 2 testified that it was her mother—not Appellant—who took her to the hospital. Accordingly, under the circumstances of this case, Appellant's remedial actions taken after he physically abused his daughters were meager at best and they did not obviate the recurrence of abuse.

Appellant's invocation of the affirmative defense of corporal punishment is equally unavailing. Section 509 provides in relevant part:

> The use of force upon or toward the person of another is justifiable if:
>
>> (1) The actor is the parent or guardian or other person similarly responsible for the general care and supervision of a minor or a person acting at the request of such parent, guardian or other responsible person and:
>>
>>> (i) the force is used for the purpose of safeguarding or promoting the welfare of the minor, including the preventing or punishment of his misconduct; and

> (ii) the force used is not designed to cause or known to create a substantial risk of causing death, **_serious bodily injury, disfigurement, extreme pain or mental distress or gross degradation_**.

18 Pa.C.S.A. § 509(1) (emphasis added). In **_Commonwealth v. Ogin_**, 540 A.2d 549 (Pa. Super. 1988), **_appeal denied_**, 557 A.2d 343 (Pa. 1988), we explained that Section 509 represents a compromise between a parent's right to use corporal punishment and the need for "limits regarding the type and severity of the corporal punishment which a parent may impose." **_Ogin_**, 540 A.2d at 554. We added that "Section 509(1)(i) and (ii) involve independent requirements and appellants are not entitled to a justification defense unless they complied with both standards." **_Id._**

For purposes of Section 509, "[t]he term 'extreme' is synonymous with excessive. [Therefore, Section 509] simply says pain inflicted as a result of discipline must not be excessive. The punishment must be justifiable and fit the misconduct. Excessive discipline is contrary to the welfare of the child, even when discipline is justifiable." **_Commonwealth v. Douglass_**, 588 A.2d 53, 56 (Pa. Super. 1991); **_see also Ogin_**, 540 A.2d at 555 (noting that "a defendant's actions are not legally justified simply because he may sincerely believe that the best way of safeguarding or promoting a child's welfare is to inflict a cruel and patently excessive punishment."). "[W]hen applying the justification statute, the court should focus not only on the degree of force exerted by the parent but also on the age and the physical and mental condition of the child who has been disciplined." **_Ogin_**, 540 A.2d at 555. The Commonwealth bears the burden of proof to show, beyond a reasonable

doubt, that the defendant is not entitled to a justification defense. **See Douglass**, 588 A.2d at 56; **see also** 18 Pa.C.S.A. § 502 (stating that "[i]n any prosecution based on conduct which is justifiable under this chapter, justification is a defense.").

Here, viewing the evidence in the light most favorable to the Commonwealth, there was sufficient evidence to establish that the force exerted by Appellant was not undertaken for the purposes of safeguarding his daughters—Victims 2, 3, 4 and 5—who were fifteen, thirteen, eleven and nine years old, respectively. Appellant frequently forced them—sometimes when they were naked—into a pushup position until exhaustion, and once beat them—while they were naked—in the shower. The evidence also reveals that Appellant forced the girls to eat a roach. Appellant's style of "punishment" went far beyond what Section 509 contemplated. **See Commonwealth v. Tullius**, 582 A.2d 1, 4 (Pa. Super. 1990) (Corporal punishment protected under Section 509 must be "necessary to maintain reasonable discipline" and be "consistent with the child's welfare"), **appeal denied**, 593 A.2d 418 (Pa. 1991).

Furthermore, the punishments employed by Appellant for rule violations, such as beating his daughters with belts, bats and the like, was designed to cause disfigurement, extreme pain, mental distress or gross degradation. As stated, all of Appellant's daughters suffered "red, blue, sometimes puffy" marks and bruises." N.T. Trial 5/24/17 at 76. Victim 3 testified that the skin was taken off her face. N.T. Trial 5/23/17 at 119-20.

Victim 2 suffered a gash to her head, an impalement in her foot, and broken fingers "hanging off" her hands, requiring hospitalizations. *Id.* at 96-101. Victim 4's teacher observed Appellant's abuse because the bruises on her legs were so bad that she could not sit down at school. N.T. Trial, 5/24/17 at 78. Victim 5 sustained welts on her arms and legs to the point that she testified to wearing certain types of clothes to conceal them. *Id.* at 53-54. Thus, Victims 2 and 3 were at risk for disfigurement and Appellant created a risk of "extreme pain, mental distress and gross degradation" for all four victims of his physical abuse. As the trial court reasoned:

> [Appellant's] four children provided extensive testimony regarding the abuse they suffered at the hands of their father. The punishments the girls faced appear to be excessive in proportion to their violations of rules, crossing the threshold from corporal punishment to malicious abuse. [Victim 2's] testimony, regarding [Appellant's] abuse, that "it seemed like it was a game, like it was fun for him to do" displays [Appellant's] mental state—that the punishments were not accomplished with an attitude of proper parental responsibility for teaching the children right from wrong, but were an abuse of the privilege of Appellant's relationship with his children.

Trial Court Opinion, 10/23/18 at 19. Therefore, viewing the evidence in a light most favorable to the Commonwealth, we conclude that the Commonwealth introduced sufficient evidence to reject Appellant's justification defense.

We lastly turn to Appellant's weight of the evidence claim. Appellant argues that none of his trial witnesses observed any injuries on his daughters and that his three biological daughters expressed a desire to live with him again. Appellant's Brief at 23.

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a

mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. It has often been stated that a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.

An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

Appellate review of a weight claim *is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.* Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Clay*, 64 A.3d 1049, 1054–55 (Pa. 2013) (internal citations and quotation marks omitted) (emphasis in original). "A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict." *Widmer*, 744 A.2d at 751.

Here, in support of his weight of the evidence claim, Appellant points out that none of the defense witnesses observed any injuries on his daughters and that his daughters have expressed a desire to live with him. At the core, Appellant challenges the trial court's credibility and weight determination, which is something we may not entertain. It is within the province of the jury to make credibility determinations and this Court will not reweigh credibility

determinations on appeal. "Conflicts in the evidence and contradictions in the testimony of any witnesses are for the fact finder to resolve." *Commonwealth v. Sanders*, 42 A.3d 325, 331 (Pa. Super. 2012) (citing *Commonwealth v. Tharp*, 830 A.2d 519, 528 (Pa. 2003)). "A jury decision to credit certain evidence and reject other testimony is appropriate; therefore, the trial court did not abuse its discretion in concluding that its sense of justice was not shocked by the verdict." *Id.* Thus, it is clear that the jury heard the testimony of all witnesses and found the testimony of the victims more credible than the testimony of Appellant's witnesses. Additionally, his daughters' desire to live with him does not mitigate the evidence of physical and psychological abuse nor does it absolve Appellant of the same. Based upon our review, we find no abuse of discretion on the part of the trial court for concluding its sense of justice was not shocked by the verdict. Appellant's final issue, therefore, fails.

Judgments of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/31/19

- 24 -